**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| MARK E. SCHELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | NO. CIV-19-0281-HE |
| | ) | |
| JANET JOHNSON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

In this 42 U.S.C. § 1983 action, both plaintiff and defendants have moved for summary judgment pursuant to Fed. R. Civ. P. 56 and LCvR56.1.[1] The briefing is complete, and both motions are at issue.

*Background*

Plaintiff Mark E. Schell (Schell) is an attorney licensed to practice law in Oklahoma. He brought this lawsuit challenging the requirements that he join in, and pay dues to, the Oklahoma Bar Association (OBA) as a condition of practicing law. According to Schell, the mandatory membership and the mandatory payment of dues violated his rights to freedom of speech and association under the First and Fourteenth Amendments to the United States Constitution. He also asserted that to the extent mandatory membership and dues were constitutional, the OBA had not provided sufficient safeguards to ensure that dues were not used for activities not germane to the OBA's purpose of regulating the legal

*[1] In light of defendants filing of a supplemental summary judgment motion [Doc. #181], their initial motion [Doc. #179] will be stricken as moot.*

profession or improving the quality of legal services in Oklahoma as required under Keller v. State Bar of California, 496 U.S. 1 (1990).

Defendants are the justices of the Oklahoma Supreme Court, the members of the OBA Board of Governors, and the executive director of the OBA (OBA defendants). They have been sued solely in their official capacities for declaratory and injunctive relief.

In response to Schell's amended complaint, the OBA defendants moved for dismissal on various grounds. The court dismissed the claims regarding the mandatory membership and dues under Fed. R. Civ. P. 12(b)(6), based upon the United States Supreme Court's decisions in Lathrop v. Donohue, 367 U.S. 820 (1961) and Keller, *supra*., but it permitted Schell's claim regarding alleged inadequate safeguards to proceed. Subsequently, the OBA Board of Governors adopted a new policy concerning the expenditure of mandatory dues which mooted the safeguards claim, resulting in its dismissal.

Schell appealed the court's Rule 12(b)(6) ruling to the Tenth Circuit Court of Appeals. That court affirmed the dismissal of the mandatory dues claim but reversed the dismissal of the mandatory membership claim. It concluded that Schell stated a plausible freedom of association claim and remanded the case to this court to assess whether two articles, which were published in the April 2017 and November 2018 issues of The Oklahoma Bar Journal (OBJ),[2] constitute speech germane to the OBA's recognized purposes. *See* Schell v. Chief Justice and Justices of Oklahoma Supreme Court, 11 F.4th

---

[2] *The two articles were not part of the record on appeal.*

1178, 1194-95 (10th Cir. 2021). Schell then filed a petition for a writ of certiorari with the Supreme Court, which was subsequently denied.

Following remand, this court granted Schell leave to file a second amended complaint. The amended pleading included reliance on additional OBJ articles and other OBA activities which Schell claims are political or ideological in nature and are non-germane to the OBA's recognized purposes. The OBA defendants moved to dismiss under Rule 12(b)(6). The court denied the motion and allowed the freedom of association claim to proceed. After conducting discovery regarding the claim, the parties filed the present motions for summary judgment.

*Legal Standard*

"A party may move for summary judgment, identifying each claim . . . on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where, as here, the court is "presented with cross-motions for summary judgment, [it] must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." United States v. Supreme Court of New Mexico, 839 F.3d 888, 906-07 (10th Cir. 2016) (quotation marks and citations omitted).

*Discussion*

As instructed by the Tenth Circuit, the court applies "the test from *Keller* to determine whether the [challenged OBJ articles and other OBA activities] are germane to the accepted purposes of the state bar." Schell, 11 F.4th at 1195. To be germane, the articles

and activities must be "'necessarily or reasonably incurred for the purpose of regulating the legal profession or improving the quality of the legal service available to the people of the State.'" *Id*. at 1192 (quoting Keller, 496 U.S. at 14) (other quotation marks and citation omitted).

Schell's freedom of association claim now rests on 13 OBJ articles, 1 email, 7 articles distributed by Lexology under an OBA logo, and certain OBA legislative activities.[3]

OBJ Articles – April 2017, May 2017, and May 2018; Email – March 2025; and Legislative Activities

As part of his claim, Schell challenges views expressed by the OBA's then-executive director, in articles published in the April 2017 and May 2018 OBJ issues, regarding "attacks" on the Judicial Nominating Commission (JNC) and "merit selection" of appellate judges and justices. In the April 2017 article, the executive director, after describing legislative bills relating to the JNC, stated in part:

> Most of the JNC bills contain provisions similar to bills that have been filed before. The consistent theme is that the JNC must be changed so that political parties or political bodies can appoint and/or confirm judges and justices . . . Under the JNC, Oklahomans have enjoyed a scandal-free court system that was once the worst in the nation when bribes, disguised as campaign contributions, bought opinions of the Oklahoma Supreme Court. It is déjà vu all over again when it comes to bills attacking and attempting to alter, amend, or dispose of the JNC. If the attempts to cripple or kill the JNC are successful,

[3] *In the second amended complaint, Schell also challenges certain OBA continuing legal education (CLE) programs. See [Doc. #116, ¶¶ 92-94]. However, he has not addressed any CLE programs in his summary judgment motion, and he has responded to the OBA defendants' undisputed facts regarding CLE programs as being irrelevant. See [Doc. #182, ECF pp. 10-11, ¶¶ 50-62]. The court concludes Schell has abandoned any CLE challenge as support for his claim.*

> it will be déjà vu all over again when big money and special interest groups elect judges and justices and campaign contributions buy court opinions.

[Doc. #178-3].

In the May 2018 article, he described certain changes to the OBA during his 15 years as executive director. He stated in part:

> What scares me is the increasing changes in the practice of law and the attacks on the profession and the courts.
>
> * * *
>
> [T]he attacks on our judiciary are the most frightening. For most of the time I have been your executive director, I have dealt consistently with attacks on our courts and the Judicial Nominating Commission . . . At times I wonder if the public possesses the knowledge of the separation of powers and a clear understanding of the role of the courts.
>
> I have been consistently amazed at how the public and the press have grasped these concepts and joined with us to preserve the Judicial Nominating Commission. A few selfless lawyer legislators have been incredibly helpful as well. I still fear the constant (and at times well-funded) attacks on merit selection of judges and justices may someday prevail. Yes, it is scary to ponder the political and corrupt system returning to our state.

[Doc. #178-4].

Schell also challenges views expressed by the OBA's then-president in an article published in the May 2017 OBJ issue, entitled "14th Amendment Guarantees Are Vital," in which she stated:

> With 2017 bringing the 50th anniversary of the creation of merit selection of Oklahoma judges utilizing the Judicial Nominating Commission (JNC), it is the perfect time for the OBA to focus

> on the fair and impartial administration of justice for the benefit of all Oklahoma citizens.
>
> We need to educate the public on the benefits of the JNC, to warn them of the potential ill effects of reintroducing politics into our judicial selection process and promote the public's understanding of the importance of separation of powers, both central and essential in a representative democracy.

[Doc. #178-15].

In addition, Schell challenges a March 2025 email sent by the OBA president to the OBA members concerning proposed changes being considered by the Oklahoma Legislature. In the email, he stated: "The OBA Board of Governors stands firm in its continued endorsement of the JNC-based model of judicial selection." [Doc. #178-14].

Along with the articles and email, Schell challenges OBA legislative activities concerning the JNC. In particular, he challenges the retention of what he describes as a legislative "lobbyist" and what the OBA refers to as a legislative "liaison." Schell asserts that the lobbyist pursued members of the Oklahoma Legislature, with pamphlets in hand that he had prepared, to persuade them to vote against any changes to the appellate judicial selection procedures. He asserts that these lobbyist activities were specifically done on behalf of the OBA. Additionally, Schell asserts the lobbyist prepared a report in February 2018 for the OBA Board of Governors, which advised them in part about the State Chamber 2030 Plan calling for a "federal system of judicial selection." [Doc. #178-5]. The plan entailed changing Oklahoma's appellate judicial nominating and selection process to a system that mirrors the federal system.

The court concludes that the challenged articles, email, and legislative activities are germane to a recognized purpose of the OBA. Specifically, the court concludes that they were reasonably related to the purpose of improving the quality of legal services available to the people of Oklahoma. The Tenth Circuit determined that the May 2017 and May 2018 articles were germane for that reason. Schell, 11 F.4th at 1193.[4] Similarly, the court concludes that the April 2017 article, the May 2025 email, and all lobbyist/liaison's activities are germane because, as stated by the Tenth Circuit, "the judicial system is designed to be an apolitical branch of government, and promotion of the public's view of the judicial system as independent enhances the public trust in the judicial system and associated attorney services." *Id.* The challenged articles, email, and activities "fall[] within those activities accepted in *Lathrop* and *Keller*." *Id*;[5] *see also* McDonald v. Longley, 4 F.4th 229, 248 (5th Cir. 2021), *cert. denied*, 142 S.Ct. 1442 (2022) ("Lobbying for legislation regarding the functioning of the state's courts or legal system writ large [] is germane.").

OBJ Article – November 2018

Next, Schell challenges an article, entitled "Tort Litigation for the Rising Prison Population," published in the November 2018 OBJ tort-themed issue. [Doc #178-16]. The article was authored by an OBA member. Schell asserts that the article is not germane because it argues that Oklahoma's prison system is underfunded and advocates for the

---

[4] *Although not expressly stated, plaintiff is presumably seeking to preserve the issue for possible further review.*

[5] *The court previously rejected Schell's efforts to base his claim on the OBA's legislative efforts. See [Doc. #132].*

elimination of tort liability exemptions for prisons and jails. While the article does criticize Oklahoma's incarceration levels and funding in light of those levels and additionally expresses, among other things, "hope that the Legislature will sensibly rewind its exemption from liability for prisons and jails," *id.*, ECF p. 5, the thrust of the article is to set forth the statutory and legal limits on claims challenging prisoners' conditions of confinement and to explain the type of claims available to prisoners. The court concludes that the article is germane because it was reasonably related to improving the quality of legal services, i.e. educating lawyers as to the legal hurdles in pursuing claims for prisoners, including tort liability exemptions, and the claims available to prisoners who may suffer injury in Oklahoma prisons and jails.

<u>OBJ Articles – February 2019 and March 2019</u>

Schell also challenges an article in the February 2019 OBJ issue by the OBA's then-president explaining why "having lawyers in the Legislature is a plus" [Doc. #178-17] and an article in the March 2019 OBJ issue by the OBA's then-chairman of the OBA's Legislative Monitoring Committee stating that a legislative panel at "the annual Reading Day" (for legislative bills) had "issued an urgent plea to any member of the bar considering a run for the Legislature to contact them. MORE LAWYERS ARE NEEDED!" [Doc. #178-18, ECF p. 1]. On appeal, the Tenth Circuit determined that "these articles are not inherently political or ideological in nature[,]" and "are germane to the OBA's core function to advance the interest of the profession." <u>Schell</u>, 11 F.4th at 1193. Schell, in his papers, acknowledges the Tenth Circuit's ruling, but "preserves his claims with respect to" the articles. [Doc. #178, ECF p. 23]. Given the Tenth Circuit's ruling and the lack of

identification of a change of law or other proper justification for a different ruling, the court rejects Schell's challenges with respect to the articles and concludes that they are germane to the stated OBA's purpose.

OBJ Article – May 2020

Schell challenges views expressed in an article in the May 2020 OBJ issue entitled "Representing Transgender and Gender-Diverse Clients." [Doc. #181, ECF p. 52]. The article was not mentioned in the second amended complaint but apparently came to light during discovery. Schell contends that the article is non-germane, asserting it "reads as a 1960s teach-in, praising the like-minded as brilliant, energetic, and thought provoking and presenting the current laundry-list of fashionable gender terminology." [Doc. #182, ECF pp. 29-30 (quotation marks omitted)]. He also asserts that the article promotes watching "films, interviews[,] and performances by trans people, attending community forum and conferences, imagining that you identify as a gender different from the sex you were assigned at birth, [and] exploring implicit bias." *Id.* at ECF p. 30 (quotation marks omitted). Although he acknowledges the article provides a list of cases that "have shaped transgender rights," he asserts that the article does not explain the cases relevance or applicability. *Id.*

The court concludes that the article is germane to the OBA's purpose of improving the quality of legal services. It provides information to assist lawyers in effectively representing LBGT[6] clients. This includes terminology, representation issues, practice

[6] *Lesbian, Gay, Bisexual, Transgender.*

tips, additional resources, and lists of cases. While the article does not specifically discuss any of the cases listed, the court concludes that such discussion is not necessary for germaneness purposes. The cases provided would be beneficial for lawyers who may be retained to represent a client regarding transgender matters and are unfamiliar with such matters.

OBJ Article – December 2020

Schell next challenges views expressed in an article in the December 2020 OBJ issue entitled "A Resilient Mindset: Take Stock of What You Lost and What You Gained to Move Forward." [Doc. #178-19]. The article was authored by a North Carolina and Oregon lawyer and founder of a company providing mindfulness-based coaching, training and consulting to attorneys and law firms. According to Schell, the article is non-germane because it "dispenses psychological advice related to COVID" and "concerns about racism and the upcoming election." *Id*. at ECF p. 3.

The court concludes, however, that the article is germane to the OBA's purpose of improving the quality of legal services. It is an article about developing a resilient approach to overcome professional and personal challenges caused by the COVID-19 pandemic. Although the article mentions in passing that the author's lawyer friend reported to her that since the pandemic's beginning, she had "frustrations with remote learning and worrying about [her] children's education, retirement accounts fluctuating, worrying about clients who have COVID, fearing for the future of the firm, concerns with racism and the upcoming election," [Doc. #178-19, ECF p. 3], the article cannot be reasonably read to advance any political or ideological position on COVID-19, racism, or the 2020 election.

The article provides specific steps for lawyers to help cultivate a resilient mindset to overcome professional as well as personal challenges that they may have been experiencing. In the court's view, the article was reasonably related to improving the quality of legal services in the particular circumstances of the pandemic. The article's resilient mindset discussion is factually distinguishable from the tweets regarding the benefits of walnuts, exercise, and sunlight found to be non-germane speech in <u>Boudreaux v. Louisiana State Bar Association</u>, 86 F.4th 620, 632-33 (5th Cir. 2023).

<u>OBJ Articles – May 2021</u>

Schell additionally challenges two articles authored by OBA members and published in the May 2021 OBJ "Black Legal History in Oklahoma" issue.

The first article is entitled "*Guinn v. U.S.*: States' Rights and the 15th Amendment." [Doc. #178-20]. Schell contends that the article attributes President Joe Biden's victory in the 2020 election to the "high turnout of Black voters" and "highlight[s] criticisms directed at states that amended voting laws in reaction" to that election. [Doc. #178, ECF p. 23]. According to Schell, the article explains that the amended voting laws are presented as "'attempts to stop fraud and expand voting rights but are met with the same type of criticism as the voting laws in *Guinn*,' i.e., that the laws attempt to 'disenfranchis[e] Black voters and creat[e] generations of distrust and pain.'" [Doc. #178, ECF pp. 23-24, quoting Doc. #178-20, ECF p. 4]. Schell argues that "the article weighs in on a highly ideological and debatable matter, painting citizens seeking reforms to restore confidence in voting systems as reactionaries[,]" and thus, is not germane to the OBA's recognized purposes. *Id.* at ECF p. 24.

While political or ideological in nature, the court concludes that the article is germane because it was reasonably directed to improving the quality of legal services available to Oklahomans. The thrust of the article is to educate lawyers about the history of voting rights for black people and, specifically, those in Oklahoma. It discusses the original Oklahoma Constitution allowing men of all races to vote as required by the Fifteenth Amendment to the United States Constitution, an early amendment to the Oklahoma Constitution requiring voters to satisfy a literacy test but having a "grandfather clause" exemption which allowed illiterate white men to vote, the impact of that amendment on voting rights for black people, and the Supreme Court's decision in Guinn v. U.S., 238 U.S. 347 (1915), striking down the amendment because the "grandfather clause" prevented black people from voting. It further points out that the Guinn decision is still a critical case regarding voting laws. While the author suggests the newly-enacted "voter restriction laws" may disenfranchise black voters and create generational distrust and pain like those at issue in Guinn, the court concludes that the article is nonetheless reasonably connected to improving the quality of legal services. The information provided would be beneficial as to lawyers' understanding of the possible impact of voting laws.

The second article challenged by Schell is "Oklahoma's Embrace of the White Racial Identity." [Doc. #178-21]. Schell contends that the article "evokes emotional readings of Oklahoma history to ultimately argue that Oklahoma's legal profession is responsible for 'very few nonwhites at the partnership or director level' in the state's major firms, using no evidence to support such a claim.'" [Doc. # 178-24, quoting Doc. #178-21, ECF p. 4].

While the article is ideologically charged in nature, the authors specifically advocate for diversity in the state's law firms, judiciary, and law faculty given the percentage of nonwhites in Oklahoma. The court concludes that the article is germane to the OBA's purposes of regulating the legal profession and improving the quality of legal services. *See* McDonald, 4 F.4th at 249-50 (bar diversity initiatives, despite being controversial and ideological in nature, are germane to the purposes identified by Keller); *see also* Boudreaux, 86 F.4th at 633 ("Promoting diversity efforts at law firms is germane[.]").[7]

OBJ Article – February 2022

Schell also challenges views expressed in an article published in the February 2022 OBJ issue entitled "Vaccine Mandates and Their Role in the Workplace." [Doc. #178-22]. It was authored by an OBA member for the labor and employment-themed issue. According to Schell, the article "praises the Biden administration's vaccine mandates as a 'last resort' after the public failed to 'consistently wear face masks in public and failed to socially distance in those first weeks of the pandemic's United States spread two years ago." [Doc. #178, ECF p. 24, quoting Doc. #178-22, ECF p. 5].

The court concludes that the article is germane to the OBA's purpose of improving the quality of legal services. The court is not persuaded the article may be reasonably read to "praise[]" the Biden administration for the COVID-19 vaccine mandates. While it does proffer reasons why the author believes the vaccine mandates were implemented, it does not specifically endorse their implementation. The court concludes that the thrust of the

[7] *The court has previously so determined. See [Doc. #132, ECF p. 4].*

article is to educate lawyers regarding the federally-mandated and voluntarily-implemented COVID-19 vaccine mandates, the recognized exemptions to the mandates, and the litigation relating to those mandates. The information provided would be beneficial to lawyers who were rendering legal services to their employer or employee clients on the subject of vaccine mandates. Thus, the article falls within Keller's germaneness standard.

OBJ Article – May 2022

Plaintiff next challenges an article in the May 2022 OBJ issue announcing the Oklahoma Bar Foundation's "Diamonds & Disco Event." [Doc. # 178-24]. He contends that the article is not germane to the OBA's recognized purposes because its purpose is to promote "goodwill," i.e. a charitable event to support the Oklahoma Bar Foundation (OBF) and its grantee partners, including, notably, the Catholic Charities of the Archdiocese of Oklahoma City. [Doc. # 178, ECF p. 25].

The court concludes, however, that the article is germane to the OBA's purpose of improving the quality of legal services. Although one of the stated purposes for the event was to celebrate the OBF's 75th anniversary, the other stated purpose was to raise "funds for access to justice programs." [Doc. #178-24]. While the Catholic Charities of the Archdiocese of Oklahoma City is one of OBF's grantee partners, it, like other OBF grantee partners, would have received grants to benefit the legal profession. The article was not simply promoting a community-engagement opportunity for lawyers, like the tweets at issue in Boudreaux, 86 F.4th at 634, but was promoting an event to raise money that would improve the quality of legal services. The court concludes that it falls within Keller's germaneness standard.

OBJ Article – May 2022

Schell further challenges an article entitled "A Silent History." It was authored by an OBA member and published in the May 2022 OBJ issue. Schell asserts that the article "amplifies a provocative view of history, but it does not concern OBA's regulatory purposes." [Doc. #178, ECF p. 25].

The article is a book review. Its purpose is to encourage the reading of the late historian Angie Debo's book, *And Still Waters Run*. Schell indicates the book criticizes the federal government for failing to keep white settlers out of Indian lands in Oklahoma. While the review no doubt has an ideological/viewpoint slant to it and the book addresses historical events occurring many years ago, that does not necessarily make it non-germane for Keller purposes. The OBJ is distributed mostly to lawyers in Oklahoma, where Indian reservations were recently re-discovered a hundred or so years after most Oklahomans understood them to be gone. *See* McGirt v. Oklahoma, 591 U.S. 894 (2020). The court's conclusions in McGirt appear to have been substantially shaped by its view of the historical record of treatment of the Indian tribes and dealings with them. Against that backdrop, it is not implausible to view the review and book as providing information useful to an Oklahoma lawyer in understanding events shaping the law in Oklahoma. However, as the article does not explicitly assert any such rationale or connection, or suggest its use as a practice aid of some sort, the court concludes that the review qualifies as non-germane, if only marginally so.

Lexology Articles

Finally, Schell challenges certain articles distributed by email to OBA members by Lexology under an OBA logo. The specific articles proffered by Schell are "The Skilled Person Uses "They/Them" Pronouns, and Why You Should Care," "An interview with Woodsford discussing ESG[8] engagement & litigation in England and Wales," "Gender recognition certificates and divorce in Scotland," "The Importance of LGBTQIA+ Visibility in The Legal Profession," "Law Firms Must Improve DEI Efforts Through Objective Work Allocation or Risk Losing Clients," "Are Law Firms Ignoring Their Most Critical Assets? Bridging the DEI Divide," and "How did we get here (and where is here)." [Doc. #178-25, Doc. #178-26, Doc. #178-27, Doc. #178-28, Doc. #178-29, Doc. #178-30, and Doc. #116-11].

In their motion, the OBA defendants challenge Schell's standing to base his claim on the Lexology articles, relying on Schell's deposition testimony that he did not know what the Lexology service was and had not used it. They contend that, because he had no injury as a result of the articles, he has no standing. [Doc. #181, ECF pp. 12, 32-33].

It is difficult to see how "standing" considerations apply here in any strict sense. It appears undisputed that Schell has standing to assert a freedom of association claim of some sort. Whether the Lexology articles are of such a nature that they tend to prove his claim or not is certainly open to debate. But, in the court's view, resolution of the question does not turn upon applying a separate standing analysis to each instance or element of proof upon which Schell relies. Rather, the question is whether the specific instances or

---

[8] *According to Schell, ESG stands for "Environmental, Social, and Governance." [Doc. #178, ECF p. 12, n. 7].*

aspects of proof tend to show activities by the OBA which would qualify as a non-germane activity under Keller. The court concludes that the Lexology articles do not.

The parties' submissions establish that Lexology is a "news aggregator" service, based in London, which distributes news articles and which the OBA provides access to as a free service to its members. The OBA does not pay Lexology for the service, and the members do not pay the OBA for it. The connection or link to the Lexology service is apparently forwarded to OBA members via email, which email includes a logo for both Lexology and the OBA on it. But the OBA does not select the content displayed and, ultimately, the content provided by Lexology to particular OBA members is controlled by the member, who has the ability to customize the nature of the material being provided to him/her. As the OBA's former executive director characterized it, it's a "big bunch of stuff that you can go in and set it for whatever you want." [Doc. #178-6 at ECF p. 125, ll. 8-10].

Ultimately, the Lexology service is not speech or activity of any kind such as might offend associational proscriptions. An OBA member does not have to use it. He/she does not pay for it, directly or indirectly. Particular articles are not displayed to the member unless the member clicks on them to select them. The member controls the sort of news articles to be sent to him/her. In these circumstances, the court can discern no coerced association with a particular viewpoint or position such as might be the basis for either a free speech or freedom of association claim. The presence of the OBA logo on the transmission email cannot plausibly be viewed as endorsing the content of articles it did not select or, for that matter, even know about. As a result, it is unnecessary to belabor

whether the particular articles Schell's counsel located via Lexology would otherwise meet a "germaneness" test if they had been distributed or somehow endorsed by the OBA defendants.

No Violation of Associational Rights

Per the above discussion, the court concludes that only one of the challenged OBJ articles ("Silent History"), and none of the other challenged activities, are non-germane to the OBA's recognized purposes. Therefore, the court must determine whether such a showing is sufficient to make out a freedom of association claim. The court concludes that it is not. In its remand order, the Tenth Circuit noted that there is "[a] potential open issue [as to] what degree, in quantity, substance, or prominence, a bar association must engage in non-germane activities in order to support a freedom-of-association claim based on compelled bar membership." Schell, 11 F.4th at 1195, n. 11. "In other words, the Tenth Circuit . . . left open the possibility that a de minimis amount of non-germane speech would not run afoul of an objecting member's associational rights." Pomeroy v. Utah State Bar, Case No. 21-cv-00219-TC-JCB, 2024 WL 1810229, at *5 (D. Utah April 25, 2024), *appeal pending*, Tenth Circuit Case No. 24-4054. Like the Pomeroy court, this court concludes that the Tenth Circuit will and should recognize some sort of de minimis exception and that it applies as to the limited instance of non-germaneness shown here.

Here, the quantity of non-germane activities was very limited and, to use of the language of the Lathrop court, the "bulk" of the bar association's activities were permissible as against the Keller factors. Lathrop, 367 U.S. at 843. Only the single OBJ article appears to meet the standard of being non-germane and, as noted above, that was a

close question. Further, the particular non-germane article, though ideological to some degree, was focused on historical events and did not obviously relate to any current political or similar dispute such that association with it might imply a particular position or approach to current issues. Finally, the circumstances surrounding the non-germane article/review would not suggest to a reasonable person anything about the beliefs of an individual OBA member. It was a book review, and it seems unlikely that anyone would assume a reviewer's take on some book necessarily implied anything about the views of OBA members generally. It was written by an individual OBA member, rather than by an OBA officer. It was published as the "Back Page" of the OBJ issue, rather than as a feature article. Further, and more significantly, the masthead of each OBJ edition included a disclaimer that "Statements or opinions expressed in the *Oklahoma Bar Journal* are those of the authors and do not necessarily reflect those of the Oklahoma Bar Association ...." [Doc. # 181, ECF p. 10, ¶ 29].[9] These circumstances would have prevented a reasonable person from attributing the viewpoint expressed in the article to the beliefs of any objecting OBA member, like Schell.

In light of the quantity, substance, and prominence, of the non-germane material involved here, the court concludes that a violation of Mr. Schell's associational rights did not occur. Summary judgment in favor of the OBA defendants on Schell's freedom of association claim is therefore appropriate.

---

[9] *Defendants' submissions indicate that the OBJ now includes such a disclaimer on each page of every "practice-themed" article. However, it appears the particular article/review at issue here preceded that practice.*

*Conclusion*

For the reasons stated, the OBA defendants' joint motion for summary judgment [Doc. #179] is **STRICKEN** as **MOOT** and their supplemental motion for summary judgment [Doc. #181] is **GRANTED.** Plaintiff's motion for summary judgment [Doc. #178] is **DENIED**.

**IT IS SO ORDERED**.

Dated this 21st day of October, 2025.

JOE HEATON
UNITED STATES DISTRICT JUDGE